Good morning to the Court, to opposing counsel. My name is Christopher Wimmer of Emergent LLP, and I'm appearing on behalf of Plaintiff and Appellant AeQuadis. AeQuadis? AeQuadis, yes, Your Honor. Okay. It's a subject of considerable debate. I speculated as to how. AeQuadis. There we go.  The magistrate judge concluded that the plaintiff, AeQuadis, did not have standing based on a factoring agreement entered into between it and a third-party Bibi. However, that contract is ambiguous and in violation of both Illinois substantive law and the standards on a Rule 56 motion for summary judgment. Don't we have something here more than simply that contract? We have a letter signed by your client and by Bibi which says to HCL, Bibi now owns everything, past, present, and future. It's as unequivocal as a letter as I can possibly imagine. And don't pay anything to AeQuadis, AeQuadis, whatever the name is. And we filed a bunch of UCCs. The UCCs are not in the record, but I assume we can take judicial notice of them if we can find them. That's the record in front of the district court in this case. What creates a material issue of fact about whether or not all these accounts have been assigned? Your Honor, that's not the entire record for the court. But even looking at those documents, they are in tension. As part of the all present and future accounts have been assigned to Bibi, and accordingly all payments for AeQuadis now and in the future should be made directly to Bibi. Do not make them to anybody else. And there's UCC1s filed that say so. So that's in the record. Tell me what the contrary evidence is in the record that creates an issue of fact about whether your client retains ownership of these accounts. First of all, Your Honor, that document cannot be accepted for its truth. It was submitted as part of a request for judicial notice. So the court below was entitled to acknowledge that that letter had been submitted to the court, but it certainly can't. Why can't it be taken? It's signed. Do you deny that your client signed it? Your Honor, that document was signed, as far as I know, by my client. By the very man who submitted an affidavit that said, no, I still own accounts. So tell me what it is in the record that creates any fact issue about whether your client still owns any accounts. Because the accounts that were assigned to Bibi, Your Honor, do not include a number of rights that AeQuadis had under the agreement with HCL. It includes the termination fees, which could never be invoiced. It includes the referral fees for future work from Cigna, which could never have been invoiced. It includes the work that HCL concealed, the revenue that HCL concealed from AeQuadis, and so AeQuadis could never issue invoices in it. And it's very clear under the Master Purchase and Sale Agreement, as well as the e-mails submitted from Bibi, show that the way this agreement works is that it's an umbrella factoring agreement. Bibi had the right to review individual invoices provided by AeQuadis and select which ones it wished to purchase as a basic matter of contractual law. And if I were reviewing the agreement by itself, I might or might not agree with you. But we not only have the agreement, we then have this letter that your client sent to HCL that said, we don't own anything anymore. Do not pay us. Pay the other guy. And so given that letter, tell me what is it that there is in the record that creates a fact issue about whether or not you still own the accounts. Again, Your Honor, that refers to accounts. The term accounts is undefined to the extent that notice of assignment is meant to refer back to the Master Purchase and Sale Agreement. The term accounts there is also ambiguous for two reasons. It's ambiguous because in the agreement it says any term not defined here will define with respect to the Illinois Commercial Code. The term accounts is not defined in the Master Purchase and Sale Agreement. The Illinois Commercial Code provides a definition of accounts, which most reasonably reads, as we detail in our brief, an account receivable. Bivey itself used this same terminology in its proposal to AeQuadis, which is also in the record as part of Mr. Singh's declaration. It described the accounts that were to be factored into this agreement as invoices. And if you look at the e-mails attached to Mr. Singh's supplemental declaration, and in particular, Exhibit A, which was corrected on appeal, Bivey talks extensively about invoices that are being factored. Why would we look at any of that if the language of the agreement combined with the notice that was sent is unambiguous? Well, the agreement itself is not unambiguous. What does the word all mean? All means all. Well, there's two layers of ambiguity. The first is accounts, as I've walked through. The second has to do with the timing of any assignment. HCL contends by— Is there any language in the agreement that says that all means only all of some things, but not other things? Well, it says it means all accounts. And so the question is, what are accounts? And if you track through the Illinois statutes, and you track through the history of dealing between Bivey and AeQuadis, it's very clear that accounts means accounts receivable, or at least at this stage there's a question of fact. That's all we have to establish. Isn't Bivey an indispensable party to this suit? I don't believe so, Your Honor. Well, you're claiming if I were HCL, I'd be worried about paying you any money because Bivey might make a claim to it. Don't they make — aren't they sort of a classic Rule 19 essential party? No, Your Honor. I don't believe they are. They've gotten a judgment against you for, I read the complaint in the Illinois case, and all accounts. And so my sense is if you ask Bivey, they wouldn't say you retain ownership of this. They would say they do. I disagree, Your Honor. If you look at — and I think Bivey would disagree as well. The Bivey lawsuit itself refers to accounts receivable it was suing on and lists particular invoices that had been factored to it by AeQuadis and for which HCL did not pay and for which it sued AeQuadis and Mr. Singh as the guarantors. What did the UCC — There is not a mention — nowhere in the face of this record is there any indication that referral fees, these other contractual rights, termination fees that AeQuadis had, had ever been factored or could have been factored. What did the UCC-1s say? The UCC — Which are not in the record. I have not seen the UCC-1s, Your Honor. But they are referred to in the letter that I just read. It said we've also filed UCC-1s. Do you know where they're filed? I don't. I can tell you, Your Honor, however, that under the terms of the Master Purchase and Sale Agreement, Bivey only has security interests and lien rights to the extent of invoices that — particular invoices that are factored. Again, this reinforces that this factoring agreement had to do with individual invoices. AeQuadis was assigning rights to these individual invoices only. The point I think we need to underscore is just basic contractual consideration. AeQuadis could not possibly have assigned termination fees worth $2.7 million — Well, you could have. And other fees. You could have possibly — Without being paid. It never reached this consideration. Stop for a second. Stop for a second. You can't say you couldn't possibly have assigned them. You surely could have. It was — it's well within the realm of possibility. Oh, yes. That's why I have to finish this sentence, Your Honor. You may be arguing that you didn't, but you can't say you couldn't possibly have done it. Oh, my point, Your Honor, was that they couldn't have done it without receiving consideration. They received no payment, and there's no indication in the record that they received payment for any of these categories of items we've discussed, invoices that were not factored to Bibi, but which HCL refused to pay, concealed revenue that AeQuadis could never invoice, and the termination fees and referral fees. So I'd like to reserve time unless Your Honor has any further questions now. Thank you. Good morning. May it please the Court, my name is Chad Schiefelbein. I represent the Appalee HCL America, Inc. A party that — May I ask you, was the term accounts ever defined? It says accounts, open paren, is here and after defined, closed paren. Was that term ever defined? Yes, Your Honor. It is defined by reference to the Illinois UCC. Okay. And then if you turn to the opening brief of the appellant in the appendix, the Illinois UCC is set forth in its entirety, and the word account has a very, very broad definition, and it includes — and this is page 29 of the appellant's brief, section 9-102A2 of the Illinois Code. It states, account means a right to payment of a monetary obligation, whether or not earned by performance, so a very broad definition. So does it include — your opponent says, look, we had, in effect, a penalty in this contract for early termination because we were going to get a percentage of stuff along the way. So if you terminated, you were going to have to pay us a lump sum. Is that an account? It's part of the account. If you look at section 1.1 of the agreement where the assignment is at, this is a complete assignment, and as Judge Keeley had said, all means all, and when you go through that definition, it includes all payments or other proceeds of the foregoing in any form. And then when you look at the definition — It doesn't — when I look at 1.1, which is why I think the subsequent letter may be of some significance, 1.1 looks to me like an option to buy. You can buy everything. It doesn't say we hereby transfer everything, does it? Well, it says it hereby assigns. So the assignment took place. Now, of course, if Bibi didn't like it, it could say we're not going to take that account, much like the assignment read in the Apex case, in the Graffiti case, which we had cited to in our brief, which are illustrative of this, what is called a complete assignment. And then, Your Honor, I think you hit it on the head in your questioning to the We have that letter. That letter is unambiguous, and it states we've assigned everything. It was signed by Mr. Singh. It's an admission by him, and there's no genuine issue of material facts. So when the district court went through its analysis — and we're here today to ask that the district court's judgment be affirmed. When it went through its analysis, it first looked at the agreement. It said that the agreement was unambiguous, all means all, everything was assigned when they entered into the agreement. Next, it looked at — Let me ask you about that language. Here's what I was stumbling on. Seller hereby assigns and agrees to offer for sale. Right. What does that mean? Well, there's an assignment, and then as these invoices get factored that have been assigned, Bibi has the right and its discretion, it goes on to say, that it can accept or reject those accounts if there was something wrong with it. So in the absence of the subsequent letter, wouldn't this agreement be at least a little bit ambiguous as to which accounts were in the possession of your — of Bibi? No, Your Honor, because going back to Judge Keeley's comment about the definition of accounts, that is very — it was a very broad — No, I understand the definition of accounts is broad, but this says we're signing and we're offering to sell to you at your option future accounts. And so in the absence of some evidence that you actually bought those future accounts, I'm not sure the agreement is enough to get you there, is it? I think it is. But as you indicated earlier, there's more in the record, and the district court considered that. Not only did it consider the agreement, but then it took the next step to say, here's this October 14th, 2011 letter where it's admission by Mr. Singh that everything has been assigned. And then it took another step and it looked at — Well, how do you know that doesn't just apply to the accounts which have been assigned? Because the letter itself states that as part of the Bibi relationships, all of Equitas' present and future accounts have been assigned to Bibi, and accordingly, all payments now or in the future should be made directly to Bibi. So the district court — Your client, I think, hasn't made any payments to anybody. In the Illinois lawsuit, there was a lawsuit that was brought by Bibi. It was dismissed without prejudice. That's not what I'm asking. There's nothing in this record. So your client hasn't paid anybody? To the extent that there were payments, those payments were made to Bibi in accordance with Section 1.1 and this notice. And Bibi is not currently pursuing your client? That is correct, Your Honor. What's your position about whether Bibi is a Rule 19 essential party in this case? I — if Bibi — Bibi owns the rights to these accounts. If Bibi wanted to — Well, they say they do. So don't we have two parties claiming ownership of a single race? Well, the district court disagreed that they owned the accounts. That's why we're asking the district court be affirmed. But if Bibi wanted to sue, it knows where to sue. I believe — and this is not in the record, it would be me speculating — the reason that the plaintiff didn't bring in Bibi is, as Your Honor had noted, there's a $600,000 judgment that they received for him. They didn't even bother to defend the Illinois lawsuit. They just allowed a default to be entered not only against Bibi, but against the personal guarantor, Mr. Singh, and walked away and then popped up two years later. Was the judgment in this case entered with prejudice? Yes. It was a final judgment. Final judgment. Then why — normally when we say lack of standing, that's a dismissal without prejudice. Shouldn't — I don't know whether standing is the right terminology here. The district court converted it to a summary judgment.  Right. On a 12B1 lack of standing, because it didn't have the right — it was not the proper plaintiff to bring this. So then the court — not only did the district court give equitous on opportunity to submit briefing, it also said submit additional briefing. And one of the points raised in the appellant's opening brief was the district court committed error because we didn't get a chance to take discovery or we didn't get a chance to make submissions. It got every chance that the district court gave, two chances, opening briefs and an additional submission, never objected to the district court's schedule, never said, hey, we've got more that's coming, we need additional time, and most importantly, on a rule for summary judgment, never filed a Rule 56 affidavit saying that we need this discovery. It was all there for the district court. The district court went through a very well-reasoned and step-by-step analysis in its opinion. And that's why we're here today to ask this court that the district court be affirmed in all regards. Unless the court has any questions, that would conclude my argument. The bottom line would be that your client gets out of the contract that's signed. It doesn't have to pay anything. No, Your Honor. What we're asking for is that the district court's judgment be affirmed. I know what you're asking for. No, I'm asking the bottom line would be that you had a contract. Your client seems not to have lived up to it. First of all, that's not before the issue before the court is on the standing. Second of all, we would dispute any of the allegations underneath. Third of all, we had already gone down this road with Bibby, and the plaintiff didn't even bother to show up in that case. So your position is if you owe money under the contract, you owe it to Bibby? That's what the assignment says. That's what the notice says. And we made the payments to Bibby pursuant to the assignment and the notice. No, I know what they all say. Just answer my question. So the law? Yes. If you owe money under the contract, you owe it to Bibby. Yes. Okay. Thank you. Thank you very much. Your Honor, I wanted to make a couple points about the notice of assignment that you've been focusing on. One is that that document cannot grant greater rights to Bibby than it had in the actual Master Purchase and Sale Agreement. So while certainly that notice of assignment can be considered in terms of interpreting the agreement, it can't grant any greater rights. So if all accounts and accounts as defined to as limited to invoices, and as the course of dealing between Bibby and Aquidist shows it was, the fact that this notice was sent does not eliminate those factual disputes. The second is if you look at the record at page 301, this is an e-mail from Bibby to Aquidist talking about this notice of assignment and what it — what a role it has. It reads, "'Customers will be receiving the notice of assignment letter that you signed, which legally notifies them of the assignment of receivables to Bibby.'" Again, it talks about receivables. "'This letter directs payments to Bibby's lockbox address. Going forward, all invoices created must contain the following remittance device.'" A couple more times in that e-mail, it talks about invoices, making clear that what was assigned under this agreement were particularly factual invoices. Fisherman. Your Honor made a moment — a point a moment ago about Bibby — HCL walking away not paying from this contract, and that's the basic reality. If this motion is granted, HCL never pays millions in dollars in early termination fees it agreed to pay under the Business Assistance Agreement. Scalia. Well, doesn't it owe them to Bibby? Fisherman.  Bibby did not sue for those amounts. What Bibby sued — Scalia. Well, that's a separate issue. Whether Bibby thinks it's worth filing a lawsuit to collect them because they dispute breach of the contract is a separate issue from whether or not Bibby has all those contractual rights. Fisherman. Your Honor, the extrinsic evidence is overwhelming that Bibby believed it only had accounts receivable that had been factored to it and sold to it. Those are the only rights it had. Thank you, Your Honor. Roberts.  Thank you. The case, as argued, will stand submitted.
judges: Kozinski, Hurwitz, Keeley